# United States Court of Appeals
## For the First Circuit

Nos. 24-1003
    24-1039

MAGNUS AADLAND,

Plaintiff, Appellant/Cross-Appellee,

v.

BOAT SANTA RITA II, INC.,

Defendant, Appellee/Cross-Appellant,

BOAT SANTA RITA III, INC.; F/V LINDA; FRANCIS A. PATANIA;
SALVATORE PATANIA, JR.,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Gelpí, Circuit Judges.

Scott W. Lang, with whom Catherine B. Kramer, Lang, Xifaras,
& Bullard, Andrew B. Saunders, and Saunders & Saunders, LLP, were
on brief, for appellant/cross-appellee.
Joseph A. Regan, with whom Francis G. McSweeney and Regan &
Kiely, LLP, were on brief, for appellees/cross-appellant.

March 17, 2025

**BARRON, Chief Judge.**  This is the second appeal that we have heard in this federal admiralty case.  It arises out of a 2017 suit that a seaman, Magnus Aadland ("Aadland"), brought in the United States District Court for the District of Massachusetts against a fishing vessel's owner, Boat Santa Rita II, Inc. ("BSR II"), and related parties.

In the operative complaint, Aadland alleges that in 2014 he fell ill while working offshore on the owner's fishing vessel and that he thereafter was owed a duty of maintenance and cure that was not satisfied.  The duty is owed by a vessel owner to a seaman who falls ill or is injured while onboard a vessel at sea. See Atl. Sounding Co. v. Townsend, 557 U.S. 404, 413 (2009) (quoting The Osceola, 189 U.S. 158, 175 (1903)).  For relief, Aadland sought, among other things, compensatory damages for unpaid maintenance and cure, compensatory damages for emotional distress, and punitive damages as well as attorney's fees.

In the first appeal, we considered Aadland's challenges to the judgment that the District Court entered against him following a bench trial on his claims.  By the time of the trial, those claims were only against BSR II and Aadland's challenges related solely to BSR II's alleged breach of its duty of cure, not its duty of maintenance.  We either vacated or reversed each of the challenged portions of the District Court's judgment and

- 2 -

remanded for further proceedings not inconsistent with our decision.

On remand, the District Court entered judgment in favor of Aadland in some respects and in favor of BSR II in others. Aadland now appeals from that judgment, while BSR II cross-appeals.

In issuing the judgment on remand, the District Court first ruled that Aadland was entitled to cure on an ongoing basis up to the point in time at which BSR II shows that Aadland has achieved what is known as maximum medical recovery ("MMR"). That is when the seaman who has suffered an on-ship illness or injury "is 'so far cured as possible'" that the vessel owner at that point no longer has an ongoing, continuous duty of maintenance and cure. Whitman v. Miles, 387 F.3d 68, 72 (1st Cir. 2004) (quoting Farrell v. United States, 336 U.S. 511, 518 (1949)).

The District Court next ruled that Aadland was not entitled to compensatory damages for unpaid cure for the period between the onset of his onboard illness in 2014 and the start of the trial in September 2020. That was so, according to the District Court, because BSR II's payment during that time of both advances to Aadland and $400,000 to Aadland's private health insurer had to be offset against any unpaid cure obligation that BSR II may have had.

In addition, the District Court ruled that Aadland was not entitled to compensatory damages for emotional distress resulting from any breach of the duty of cure by BSR II. And, finally, the District Court ruled that Aadland was not entitled to punitive damages or attorney's fees for any such breach.

Aadland does not challenge on appeal the District Court's ruling that, due to BSR II's payments to him and his private health insurer, he is owed no compensatory damages for unpaid cure. However, insofar as the District Court's judgment is unclear as to whether BSR II breached its duty of cure as of September 2020, he contends, and we agree, that he is entitled to judgment that such a breach occurred. He also challenges the District Court's judgment denying both his request for compensatory damages based on emotional distress and his request for punitive damages as well as attorney's fees. We affirm the portion of the judgment that denies the former request but vacate the portion that denies the latter one.

As to the cross-appeal, we first consider BSR II's challenge to the District Court's ruling that Aadland is entitled to cure on a going-forward basis from September 2020 up to the point in time at which BSR II can show that he has achieved MMR. We then address BSR II's challenge to the District Court's ruling that its $400,000 payment to Aadland's private insurer entitles it to a setoff against its cure obligation of only that amount rather

than $605,338.07, which it contends is the proper setoff amount. We affirm the judgment issued by the District Court with respect to both rulings.

**I.**

**A.**

Aadland filed his complaint in the District of Massachusetts in 2017 against BSR II and four related parties: Boat Santa Rita III, Inc., F/V Linda, Salvatore Patania, Jr., and Francis A. Patania ("Patania"). A three-day bench trial began in September of 2020.

By that time, only one defendant, BSR II, and two counts from the original complaint -- Counts III and IV -- remained in play. In Count III, Aadland sought compensatory damages for any unpaid obligations that BSR II owed under the duty of maintenance and cure. In Count IV, he sought both compensatory damages for emotional distress caused by BSR II's failure to fulfill the maintenance and cure duty that it owed prior to the start of the trial and punitive damages as well as attorney's fees for that same failure.

Although the duty of maintenance and cure is often referred to as a single duty, it has two distinct aspects -- "maintenance" and "cure." The duty of maintenance makes the vessel owner responsible for "the provision of, or payment for, food and lodging" for the ailing seaman. LeBlanc v. B.G.T.

- 5 -

Corp., 992 F.2d 394, 397 (1st Cir. 1993).  The duty of cure obliges the vessel owner to pay "necessary health-care expenses . . . incurred during the period of [the seaman's] recovery from an injury or malady."  Id.

**B.**

The District Court made the following findings of fact, which neither party contests on appeal.  Aadland served as the captain of the F/V Linda, owned by BSR II, during a commercial scalloping trip that left New Bedford, Massachusetts on July 9, 2014.  Several days into the trip, while at sea, Aadland fell ill.  His condition worsened, and the F/V Linda reversed course and traveled back to port.

An ambulance met Aadland upon arrival in New Bedford, Massachusetts on July 18, 2014.  He was transported to a hospital and diagnosed with a group G Streptococcus infection.  Aadland spent much of the next six months, from July 18, 2014, to December 29, 2014, receiving medical care at various inpatient facilities.  He was then discharged and received outpatient treatment until July 9, 2015, when he was again admitted to the hospital due to health complications that stemmed from the infection.

Aadland was released from this second period of hospitalization on September 10, 2015.  He thereafter received outpatient treatment for symptoms attributed to the infection.

From the onset of the illness in July 2014 through September 2014, Aadland received Tufts health insurance ("Tufts") through GAF Engineering, the then-employer of his wife, Cynthia Aadland. During that time, Tufts paid for the majority of Aadland's care and BSR II reimbursed him for the out-of-pocket medical expenses, $5,388.24 in total, that he submitted to BSR II.

Cynthia Aadland stopped working at GAF Engineering in September 2014. From October 2014 through April 2017, Aadland was covered by a Tufts Consolidated Omnibus Budget Reconciliation Act ("COBRA") continuation of health insurance plan, for which he paid monthly premiums. Tufts continued to pay for the medical care that he received as a result of his illness during that period. In April 2017, he also obtained healthcare coverage through Medicare.

From December 30, 2014, to October 16, 2020, Aadland was paid maintenance of $84 per day by BSR II.[1] By the time of the trial, this maintenance amounted to $175,644. During this same period, BSR II paid him "advances" of $114 per day. These advances totaled $238,374. Additionally, Tufts accepted $400,000 from BSR II in full satisfaction of any lien or claim that it might have had against Aadland or Cynthia Aadland for coverage of

---

[1] Aadland received the first payment from BSR II on February 5, 2015, backdated to and containing the amount owed by BSR II from December 30, 2014.

Aadland's medical expenses. BSR II indicates that it made this payment on the "eve of trial."

## C.

The District Court entered its judgment in favor of BSR II on October 16, 2020. It first determined that Aadland had reached MMR by the time of the bench trial in September 2020. Based on this ruling, the District Court determined that Aadland was not entitled to maintenance or cure on a going-forward basis. The ruling did not affect, however, any obligation that BSR II had under either of those duties prior to the time of the trial.

With respect to BSR II's duty of maintenance up to September 2020, the District Court ruled that BSR II had satisfied that duty. The District Court did so on the ground that "[s]ince February 5, 2015, [BSR II] has provided Aadland maintenance at the same daily rate of $84.00." As to BSR II's duty of cure up to September 2020, the District Court noted that "Aadland made no request for cure from BSR II" prior to filing suit and that "[t]here were no out-of-pocket medical expenses for Aadland that BSR II declined to pay." The District Court then proceeded to address Aadland's contention that, despite these findings, BSR II failed to satisfy its cure obligation as of September 2020.

Aadland emphasized to the District Court the evidence in the record that showed that Tufts -- and not BSR II -- paid for the onboard-illness-related medical care that he had received

prior to September 2020. He also emphasized the evidence in the record that he argued showed that he secured insurance from Tufts both through his wife's employment and, during the period in which he had insurance through Tufts COBRA health insurance plan, his own payment of premiums. Aadland argued to the District Court that, under the Fifth Circuit's decision in Gauthier v. Crosby Marine Service, Inc., 752 F.2d 1085 (5th Cir. 1985), these features of the record showed that the duty of cure obliged BSR II to pay for the costs of his healthcare related to his onboard illness up to the start of the trial. That was so, he contended, notwithstanding that Tufts had paid for the care. In pressing this contention, Aadland described Gauthier to the District Court as holding that "when medical care payments are made on behalf of the injured seaman by a medical insurance policy provider which the injured seaman has purchased separate and apart from the vessel owner, the payments are not to be considered as being furnished at no expense to the injured seaman."

The District Court ruled that Gauthier did not apply because it was distinguishable on its facts. The District Court explained that "[u]nlike the circumstances there which the [Fifth Circuit] analogized to an instance where a shipowner disregarded an injured seaman's maintenance and cure claim and then wanted to set off any money earned by the seaman during the pendency of the claim, there was no such refusal here." The District Court also

determined that Aadland, unlike the seaman in Gauthier, had not "incurred any medical expenses" for the cost of his care. That was so, according to the District Court, because of both the advance payments that BSR II had made to Aadland and the fact that "[t]here are no outstanding medical expenses or reimbursements for Aadland's medical care that Aadland is obligated to pay."

In that regard, the District Court pointed to its finding that "Tufts has accepted $400,000.00 from BSR II in full satisfaction of any lien or claim it might have against Aadland or Mrs. Aadland for coverage of Aadland's medical expenses." It found that, as a result of that payment, "Tufts has no claim or lien against Aadland (or his wife) for medical expenses or reimbursements" with respect to medical services provided prior to September 2020 that related to Aadland's onboard illness.

The District Court went on to reject Aadland's request for punitive damages and attorney's fees on the ground that "BSR II has not withheld maintenance and cure payments." The District Court added that "[t]o the extent that Aadland claims that the timing of BSR II's payments to him were unreasonably delayed," it "d[id] not agree on this record." It further explained that it "d[id] not conclude that, even if there had been a showing of a failure to pay maintenance and cure, Aadland has shown that BSR II was callous, willful, or recalcitrant in such alleged failure."

- 10 -

Finally, the District Court rejected Aadland's request for compensatory damages for emotional distress arising from BSR II's asserted failure to satisfy its duty of cure within the period up to September 2020.  The District Court concluded that it "d[id] not need to reach [Aadland's claim for emotional distress damages] because of Aadland's failure to show that BSR II was callous, willful or recalcitrant" in any breach of the duty of maintenance and cure.

**D.**

Aadland appealed.  He contended that the District Court erred in: (1) ruling that BSR II had satisfied its duty of cure up to September 2020; (2) denying his request for punitive damages and attorney's fees; (3) denying his request for compensatory damages for his alleged emotional distress arising from BSR II's asserted failure to satisfy its duty of cure in a timely manner during the period up to September 2020; and (4) ruling that he had achieved MMR as of September 2020, such that BSR II had no going-forward duty of cure from that date.

We reversed the District Court's ruling that Aadland had achieved MMR as of September 2020.  Aadland v. Boat Santa Rita II, Inc. (Aadland I), 42 F.4th 34, 37-38 (1st Cir. 2022).  We vacated the District Court's ruling that, as of September 2020, BSR II had satisfied its duty of cure up until that time.  Id. at 37.

- 11 -

In explaining our reasons for vacating the latter ruling, we noted that the District Court "did not purport to take issue with" either Gauthier or Aadland's account of it. Id. at 44. We also noted that we understood the District Court to have based its ruling on the determination that Gauthier was factually distinguishable. Id. We then further explained that we understood the District Court to have distinguished Gauthier, at least in part, based on its finding that "Aadland failed to request cure as the seaman in [Gauthier] had." Id. at 44.

We determined that this aspect of the District Court's reasoning was problematic. Id. We did so on the ground that Aadland's failure to have made such a request could not provide a valid ground for distinguishing Gauthier on its facts, given that BSR II did not dispute that Aadland had no obligation to request cure. Id.

We then addressed BSR II's argument that we could nonetheless affirm the District Court's determination that Gauthier was distinguishable on its facts. Id. at 45. Specifically, BSR II contended that, unlike the seaman in Gauthier, Aadland did not "alone purchase[] [his] medical insurance," thereby precluding him from benefitting from Gauthier's holding. Id. (alterations in original) (quoting Gauthier, 752 F.2d at 1090).

BSR II based this contention in part on the fact that Aadland's wife helped him purchase the health insurance in question. Id. We explained that "we [were] not persuaded by [BSR II's] implicit assertion that the use of one spouse's paycheck to fund the insurance of the other is necessarily a 'gift' from the one to the other in the same way that perhaps a parent paying the premiums of an adult child might be viewed." Id. at 45-46.

We recognized that, ordinarily, a seaman who receives financial support from a parent or a wealthy relative to pay for medical care does not "incur" for the purposes of cure the expenses that were covered by that financial support. Id. at 45 (first citing Johnson v. United States, 333 U.S. 46, 50 (1948); and then citing In re RJF Int'l Corp., 334 F. Supp. 2d 109, 113 (D.R.I. 2004)). But we concluded "that the nature of the relationship between the seaman and the person providing financial assistance to him matters." Id. at 45. We then explained that, "given that it is not unusual for a married couple to share finances," the use of a spouse's resources differs materially from the use of funds provided by a parent or wealthy relative. Id. at 45-46. Accordingly, we held that neither Aadland's receipt of coverage from his wife's employer nor his paying for the coverage with financial resources that he shared with his wife showed that Aadland did not "alone purchase" his health insurance. Id. at 46.

We also addressed an additional ground that BSR II advanced for concluding that Aadland did not "alone" pay for the health insurance and thus for our affirming the District Court's determination that Gauthier was factually distinguishable. In pressing this ground, BSR II relied on the fact that, as recognized by the District Court, it provided Aadland with "advances" that he used, at least in part, to pay the relevant insurance premiums to the insurer, Tufts. Id. at 46-47.

In rejecting this basis for distinguishing Gauthier on its facts, we explained that Gauthier held that "where a seaman has alone purchased medical insurance, the shipowner is not entitled to a set-off from the maintenance and cure obligation moneys the seaman receives from his insurer." Id. at 44 (quoting Gauthier, 752 F.2d at 1090). In other words, we explained that Gauthier stands for the proposition that if a seaman independently purchases medical insurance and uses that insurance to pay for medical care that is covered by the duty of cure, then the seaman may be said to have "incurred" the cost of his care as billed to the insurer for the purposes of cure, such that the seaman may recover that amount, less any setoffs, from the vessel owner. Id. at 44-48; see Gauthier, 752 F.2d at 1090. We then further explained that, based on that understanding of Gauthier, "Aadland would have been in all relevant respects 'abandon[ed] . . . to his fate'" insofar as BSR II had extended the advances to Aadland only

as loans.  Aadland I, 42 F.4th at 46-47 (alterations in original) (quoting Dutra Grp. v. Batterton, 588 U.S. 358, 375 (2019)).  We also "emphasize[d], if [Aadland] did alone purchase th[e] insurance" -- as would be the case if the advances were loans -- "then [BSR II] would not be entitled to set off from their cure obligation the roughly $600,000 . . . that Aadland's medical providers received from [Tufts] as payment for their treatment of his on-ship illness."  Id. at 47-48.

We ultimately concluded that it was not clear from the record whether the advances that BSR II paid to Aadland did constitute loans.  Id.  We also noted that the District Court did not make a finding as to whether the advances were loans or not.  Id. at 46.  Thus, we vacated the District Court's judgment to BSR II on Aadland's breach-of-the-duty-of-cure claim and remanded for further proceedings not inconsistent with our decision.  Id. at 47.

Before concluding our analysis of whether BSR II had breached its duty of cure as of September 2020, though, we chose to address "the question as to what the proper measure of cure is" for the period up until that time.  Id. at 48.  We explained that it was important to do so because this question could be relevant on remand.  Id.

We acknowledged Aadland's contention that the proper measure of cure is "the 'sticker price' of the healthcare that he

received, which is $1.2 million." Id. Nonetheless, we agreed with BSR II that "Gauthier never resolved how much cure the shipowner there owed the seaman," id., and that Manderson v. Chet Morrison Contractors, Inc., 666 F.3d 373 (5th Cir. 2012), a later-decided case from the Fifth Circuit, did. Manderson held, as we characterized it, that:

> [W]hen a seaman alone purchases his medical insurance, such that Gauthier's no-set-off rule applies, "the relevant amount" owed as cure is not the "sticker price" the healthcare providers assign to the care that they provided to the seaman to treat his on-ship illness or injury. Rather, "the relevant amount is that needed to satisfy the seaman's medical charges," which there was the "lower amount paid by [the seaman's] insurer."

Aadland I, 42 F.4th at 48-49 (second alteration in original) (quoting Manderson, 666 F.3d at 382).

Accordingly, we concluded that, "insofar as Gauthier does apply . . . . [and] insofar as Aadland did alone purchase the insurance in question, . . . the cure owed here is the roughly $600,000 that his healthcare providers accepted as payment for his care from his insurer." Id. at 50. We therefore rejected Aadland's contention that the measure of cure under Gauthier was double that amount. Id.

In addition, we identified various issues for the District Court to address on remand with respect to the duty of cure. Specifically, we left to the District Court the assessment

- 16 -

of whether Gauthier's reasoning should be adopted; whether Aadland had paid for his insurance "alone" with respect to his medical care for his onboard illness, and thus whether, if Gauthier were adopted, it would apply on these facts; whether the advances that Aadland received from BSR II up to September 2020 were loans; what cure was paid by BSR II up until that time; and whether BSR II had satisfied its cure obligation as of September 2020.  Id. at 50-51.

Finally, we turned to Aadland's challenge to the District Court's rulings in BSR II's favor as to his request for compensatory damages for emotional distress and his request for punitive damages as well as attorney's fees.  Id. at 52.  We observed that "the District Court's judgment in this regard relied on its determination that Aadland was not deprived of any cure owed to him by [BSR II] because Gauthier did not apply."  Id.  Because we ruled that this determination rested on an erroneous legal basis, we vacated those portions of the District Court's grant of judgment to BSR II.  Id.

### E.

On remand, the District Court "solicited the parties' proposal for a new schedule, considered supplemental briefing from the parties on the outstanding issues, heard oral argument and took the matter under advisement."  The District Court issued its decision in December 2023.

- 17 -

As to whether Aadland had reached MMR by September 2020, the District Court considered evidence from BSR II that had not been at issue in Aadland's appeal from the District Court's prior judgment. Despite considering this evidence, the District Court ruled that BSR II had not met its burden to prove that Aadland had reached MMR as of September 2020.

The District Court then turned to Aadland's breach-of-the-duty-of-cure claim. It framed the issue on remand as requiring that it determine "the measure of BSR II's cure obligation as of September 2020 and whether that obligation is offset by any payments already made."

The District Court first determined that the "cure obligation is $605,338.07, the amount that Tufts paid to Aadland's medical providers." It thus rejected Aadland's contention that the cure obligation was the roughly $1.2 million that the medical providers originally billed Tufts.

As to "whether that obligation is offset by any payments already made," the District Court concluded that Gauthier would "guide [its] analysis," such that "Aadland should be entitled to recover his medical expenses, even though they were paid for by Tufts, so long as the insurance was not gifted to him by a third party, but rather a reasonable expense paid out of his shared finances with his wife." Based on this understanding of Gauthier, the District Court went on to rule that "BSR II may not offset its

- 18 -

cure obligation with the [funds] Tufts paid to satisfy Aadland's medical bills."

In so concluding, the District Court rejected BSR II's contention that its payment of advances to Aadland meant that "Aadland did not pur[chase] his insurance alone such that the Gauthier analysis would not apply." The District Court noted that "BSR II itself did not purchase or provide health insurance on Aadland's behalf" and "did not require Aadland to spend the advances on health insurance as opposed to other necessities or incidentals." It continued, finding that "though BSR II's insurance broker included the health insurance premiums in his calculation of the appropriate maintenance and advances due to Aadland, BSR II did not communicate to Aadland any intent that the advances be used for health insurance." The District Court thus found that Aadland paid for his health insurance alone, although it did so without determining whether the advances were loans.

The District Court went on to explain, however, that Aadland did not dispute that BSR II's $400,000 payment to Tufts "should be credited towards its cure obligation." It then determined that, as a result, that payment applied as a setoff in favor of BSR II against its roughly $600,000 cure obligation as of September 2020.

The District Court next addressed the import of the advances that BSR II had paid to Aadland, and it explained that

- 19 -

"[a]lthough . . . BSR II's advances did not reduce its cure obligation in the first instance, the advances remain relevant to what amount BSR II now owes Aadland." The District Court noted that each advance had a receipt, signed by Aadland, and that each receipt stated the payment was an "ADVANCE toward any settlement, judgment or award resulting from my claim for personal injuries or illness occurring on or about 7/20/2014 while aboard the F/V LINDA." It then concluded that it "must enforce the terms of this contract between Aadland and BSR II, which provides that any future judgment against BSR II be reduced by the amount of the advances paid."

Thus, the District Court credited not only the "$400,000 payment to Tufts" that BSR II had made but also the "$238,374.00 in advances paid" by BSR II to Aadland against the $605,338.07 that it determined was owed as cure. In consequence, the District Court found that BSR II had a "$33,035.93 . . . credit against any continuing cure obligation . . . after September 2020," as BSR II had paid Aadland more than he was owed as cure.

Finally, the District Court ruled that Aadland was not entitled either to damages for emotional distress or to punitive damages as well as attorney's fees based on BSR II's asserted breach of its duty of cure as of September 2020. It based these rulings on grounds independent of whether BSR II had breached the duty of cure.

This timely appeal by Aadland and cross-appeal by BSR II followed.

## II.

"When a district court conducts a bench trial, its legal determinations engender de novo review," as do its "determinations about the sufficiency of the evidence." United States v. 15 Bosworth St., 236 F.3d 50, 53 (1st Cir. 2001). A district court's factual findings are reviewed for clear error. See id.; see also Fed. R. Civ. P. 52(a)(6).

A district court's resolution of mixed questions of law and fact is typically treated with deference. Vinick v. United States, 205 F.3d 1, 6 (1st Cir. 2000). But, if the district court "'premise[s] its ultimate finding . . . on an erroneous interpretation of the standard to be applied,' . . . . we treat the trial court's conclusion as a question of law," entitled to no deference. Id. at 7 (first alteration in original) (quoting United States v. Parke, Davis & Co., 362 U.S. 29, 44 (1960)).

## III.

On appeal, Aadland does not dispute the District Court's rulings that credit BSR II's payment of both the advances to him and the $400,000 to Tufts as setoffs against any liability that BSR II owed for any breach of its duty of cure prior to September 2020. Aadland nonetheless contends that, notwithstanding those rulings, the District Court did not rule one way or the other as

to whether BSR II had in fact committed such a breach. Aadland then goes on to contend that he is entitled to judgment that this breach occurred.

This contention matters to Aadland's appeal even though he is not contesting the District Court's ruling on remand that, based on the setoffs, BSR II owed him no compensatory damages for any unpaid cure as of September 2020. After all, Aadland is challenging the portions of the District Court's judgment that denied his requests for compensatory damages for emotional distress and punitive damages as well as attorney's fees, and a premise of each of those requests is that BSR II breached its duty of cure as of September 2020.

Although BSR II agrees with Aadland that the District Court did not pass on the breach issue one way or the other, we see no reason to remand for the District Court to resolve the breach issue in the first instance. This is the second appeal in this case, Aadland has fully briefed the issue in this appeal, BSR II has directly responded to that briefing, and Aadland is contending that this record compels the finding that the breach occurred. We thus begin our analysis of Aadland's appeal by addressing the breach issue.

Moreover, because, as we will explain, we conclude that the breach issue must be resolved in Aadland's favor, we also proceed to address his challenges to the portions of the District

Court's judgment denying his request for compensatory damages for emotional distress and his request for punitive damages as well as attorney's fees. For the reasons set forth below, we affirm the District Court's judgment insofar as it denies the former request but vacate the judgment insofar as it denies the latter.

### A.

As to the breach issue, Aadland argues that BSR II breached its duty of cure as of September 2020 because it "untimely and partially paid its cure obligation." In advancing this argument, Aadland points to unchallenged findings below that establish that Tufts -- his private medical insurer -- paid for the care that related to his onboard illness. Aadland also points to both the District Court's finding that he paid for his insurance coverage from Tufts "alone" and the District Court's determination that, in consequence, BSR II owed cure under Gauthier as of September 2020 in the amount of the roughly $600,000 that the private insurer paid for his care. Aadland then contends that he is entitled to judgment that BSR II breached its duty of cure because the record clearly shows both that BSR II failed to pay adequate cure as of September 2020 and that, insofar as the record

shows that BSR II ultimately did pay the total amount of cure that it owed as of then, it paid such cure in an untimely manner.[2]

In responding to Aadland's contention on appeal, BSR II does not dispute the District Court's determination that BSR II owed cure to Aadland due to his onboard illness. It also does not dispute that the proper measure of its cure obligation as of September 2020 is the $605,338.07 that Tufts had paid healthcare providers for Aadland's care. Finally, it does not take issue with the District Court's decision to rely on Gauthier to arrive at this now-undisputed measure of BSR II's cure obligation as of September 2020, even though our prior decision in this case did not hold that Gauthier necessarily did apply here. Nonetheless, BSR II contends that Aadland is not entitled to judgment that it breached its duty of cure because it "paid maintenance, reimbursed Aadland's out-of-pocket medical expenses, provided generous advances, and settled with Tufts." We are not persuaded.

We do not see -- and BSR II does not explain -- how the payment of maintenance to Aadland bears on whether it breached its separate duty of cure. See LeBlanc, 992 F.2d at 397 (discussing how the duty of maintenance and the duty of cure impose distinct

_____

[2] Because we agree with Aadland that he is entitled to judgment that BSR II breached its duty of cure to him on the ground that the advances were not cure and did not suffice to satisfy BSR II's undisputed cure obligation, we need not reach his other arguments for why he is entitled to such a judgment.

- 24 -

obligations).  We also agree with Aadland that BSR II's reimbursement of his out-of-pocket expenses fails to show that there was no breach of the duty of cure, given that this reimbursement represented, as Aadland emphasizes, less than one percent of the amount of BSR II's undisputed cure obligation.

That leaves only BSR II's contentions about the import of both its payment of advances to Aadland and its payment of $400,000 to Tufts.  We conclude that those contentions fail as well.

The advances constituted cure, according to BSR II, because (1) BSR II calculated their value in part based on the cost of Aadland's health insurance premiums, and (2) evidence in the record shows that, through a third party, BSR II had advised Aadland and his wife that the advances were intended to cover their health insurance premiums. BSR II further argues that any contrary District Court findings were clearly erroneous.

In disagreeing with BSR II, Aadland argues that the advances did not constitute cure because the record compels the conclusion that the advances functioned as loans.  He directs our attention to the District Court's finding, based on signed receipts that accompanied each advance payment, that each "advance[] [was] characterized as an 'ADVANCE toward any settlement, judgment or award resulting from my claim for personal injuries or illness occurring on or about 7/20/2014, while aboard the F/V LINDA.'"

Aadland also emphasizes that the District Court applied the advances as a setoff not because they constituted cure but because the District Court concluded that it "must enforce the terms of this contract between Aadland and BSR II, which provides that any future judgment against BSR II be reduced by the amount of the advances paid." (Emphasis added). He then reasons that it follows that the advances must be considered loans "to be repaid by Aadland to BSR II when a judgment or award is issued" or when a settlement is reached. Furthermore, Aadland reminds us that we held in Aadland I that, if the advances were loans, then they would not be cure, as "in that event, Aadland would have been in all relevant respects 'abandon[ed] . . . to his fate.'" Aadland I, 42 F.4th at 46 (alteration in original) (quoting Dutra Grp., 139 S. Ct. at 2286).

We find it significant, in assessing whether the advances were loans, that they clearly could be recovered as setoffs against a judgment even if that judgment were not duplicative of Aadland's entitlements under the duty of cure. Our holding in Block Island Fishing, Inc. v. Rogers, 844 F.3d 358 (1st Cir. 2016), shows why this feature of the record is significant.

We held in Block Island Fishing -- as BSR II itself points out in its briefing -- that "once a shipowner pays maintenance and cure to the injured seaman, the payments can be recovered only by offset against the seaman's damages award -- not

by an independent suit seeking affirmative recovery." Id. at 366 (quoting Boudreaux v. Transocean Deepwater, Inc., 721 F.3d 723, 728 (5th Cir. 2013)).  Moreover, in so holding, we "adopted the ruling of the Fifth Circuit in Boudreaux v. Transocean Deepwater, Inc.," id. at 359, which establishes that a vessel owner may offset "damages recovered by the seaman to the extent they duplicate maintenance and cure previously paid," Boudreaux, 721 F.3d at 727 (emphasis added).

In other words, in Block Island Fishing, we determined that, if a seaman recovers damages from a vessel owner that are tied to the same expenses that have already been covered by maintenance and cure payments made by that vessel owner, then the vessel owner may deduct those prior payments from the judgment to prevent double recovery.  Id.  In so holding, however, we also held that a vessel owner generally may not apply cure payments as a setoff against a non-duplicative judgment.  Id.

Against that legal backdrop, the findings below compel the conclusion that the advances at issue here operated -- for all relevant purposes -- as loans.  They were to be credited, by their plain terms, against even a judgment that was not duplicative of a judgment for cure itself.  Accordingly, we do not see how these advances could constitute cure.  Indeed, in the prior appeal in this case, we held that, insofar as the advances were loans, they could not constitute cure.  See Vaughan v. Atkinson, 369 U.S. 527,

- 27 -

532-33 (1962) ("Maintenance and cure differs from rights normally classified as contractual. . . . '[N]o agreement is competent to abrogate the incident.'" (quoting Cortes v. Balt. Insular Line, 287 U.S. 367, 371 (1932))).

Notably, BSR II does not dispute that the advances would have to be repaid against a judgment or award for Aadland even if that judgment in his favor were not duplicative of what he was owed as cure. Indeed, BSR II acknowledges that the record "inarguably establish[es] that the advances were not a loan Aadland would be required to repay other than as a credit against any settlement, judgment, or award resulting from his claims." (Emphasis added).

BSR II nonetheless maintains that "Aadland's argument that paying advances amounts to abandonment is without merit." BSR II does so in part because it argues that "advances serve as mechanism by which a vessel owner can provide for the needs of an injured seaman without waiving its right to contest a disputed item of the seaman's claim." But we are not persuaded by this response insofar as it challenges either Aadland's contention that the advances functioned as loans or his contention that, because they did, they cannot constitute cure.

BSR II argues that the advances constituted cure because the use of advances is "commonplace" in the context of "seaman's personal injury claims." BSR II explains that "[b]ecause a vessel

owner presented with a claim for maintenance and cure has limited time to investigate and begin paying, advances have become a common tool for vessel owners to begin making immediate payments to injured seam[e]n without relinquishing the right to subsequently contest the duty."

We may assume that advances can play a role in permitting a vessel owner to "mak[e] immediate payments" while the owner investigates a seaman's claim. Here, however, BSR II concedes that "after promptly investigating the claim[,] the vessel owner must decide whether to pay or deny the claim." And yet, for the six years after Aadland suffered his illness that manifested while at sea, BSR II provided him with these advances, which could be credited against a judgment that was non-duplicative of the cure owed. At no point does BSR II explain how its claimed right to "promptly investigat[e]" Aadland's claim for cure provides a basis for it having provided him with only advances of this kind for that long.[3] We thus conclude that BSR II's asserted need to

---

[3] At oral argument in the first appeal, BSR II indicated that "there was some confusion initially" about the cause of Aadland's illness and some evidence that "[Aadland] had suffered potentially a bug bite and that might be the source of the infection, a week prior to the trip, when he was in Maine." BSR II acknowledged that it "eventually determined that it was a case in which we were obligated to pay maintenance and cure . . . . It quickly became apparent that it wasn't necessarily the bug bite." BSR II also suggested that the delay in paying cure was in part because the owner was not as familiar with the cure obligation owed to a seaman who falls ill rather than suffers an injury.

investigate Aadland's claim fails to provide any basis for concluding that BSR II did not breach its cure obligation. See Sullivan v. Tropical Tuna, Inc., 963 F. Supp. 42, 45 (D. Mass. 1997) (concluding that vessel owner breached the duty of cure "by delaying one month before approving [the seaman's] surgery, and that this breach was both unreasonable and willful"); Bickford v. Marriner, No. 2:12-CV-00017, 2012 WL 3260323, at *4 (D. Me. Aug. 8, 2012) ("Although the shipowner has the right to investigate whether the seaman is entitled to maintenance and cure payments, the vessel owner must not unduly delay its decision."); see also Hines v. J.A. LaPorte, Inc., 820 F.2d 1187, 1190 (11th Cir. 1987) (noting "laxness in investigating a claim" for maintenance and cure as an "example[] of willfulness meriting punitive damages and counsel fees" (quoting Tullos v. Res. Drilling, Inc., 750 F.2d 380, 388 (5th Cir. 1985))).

BSR II separately argues that the advances must be deemed cure to "resolve the 'unfair conundrum' raised in Bickford." See Bickford, 2012 WL 3260323, at *5. The claimed conundrum is that, even though a vessel owner cannot recover any overpayment in cure, the owner faces punitive damages if the owner willfully withholds cure.

As Aadland points out, however, Bickford described the vessel owner's position as a "supposedly unfair conundrum," id. (emphasis added), and the phrase "unfair conundrum" appeared in

- 30 -

the opinion in that case only as a quotation from the defendant vessel owner's briefing, id. at *2. In addition, the district court there rejected the vessel owner's proposed alternative mechanism for paying cure that would have allowed the owner potentially to recover payments made during the period of its investigation. Id. at *5.

In any event, there would be a problem for BSR II even if we were to assume that the advances that BSR II paid Aadland did constitute cure: the advances would not show that BSR II satisfied its cure obligation as of September 2020 in a timely manner. The undisputed record shows that the advances were first made to Aadland in February 2015, backdated to December 2014. And while it is undisputed that by the start of the trial in September 2020 BSR II had paid Aadland $238,274 in advances, it is also undisputed that by December 2014 he already had incurred over $300,000 in healthcare expenses related to his onboard illness. See Farrell, 336 U.S. at 519 (observing that cure is to be paid "in kind and concurrently with its need"); Vaughan, 369 U.S. at 531 (finding breach where seaman "was forced to hire a lawyer and go to court to get" what was owed under the duty of maintenance and cure).

BSR II's remaining argument as to the breach issue rests on its $400,000 payment to Tufts to indemnify Aadland and his wife. BSR II concedes, however, that the payment to Tufts was made on

- 31 -

the "eve of trial," which means that it was made six years after the onset of the onboard illness that triggered the duty. This payment therefore also fails to show that BSR II did not breach its duty -- given that the duty requires the timely payment of cure -- between the onset of Aadland's onboard illness in 2014 and the start of litigation. See Farrell, 336 U.S. at 519; Sullivan, 963 F. Supp. at 45-46 (concluding that vessel owner breached the duty of cure "by delaying one month before approving [the seaman's] surgery, and that this breach was both unreasonable and willful" even though the vessel owner had paid all medical bills prior to trial); see also Vaughan, 369 U.S. at 531.

Accordingly, although the District Court did not rule directly on the issue of whether BSR II had breached its duty of cure to Aadland as of September 2020, we conclude that he is entitled to judgment that this breach occurred. We thus turn to Aadland's remaining challenges on appeal, which do not take issue with the District Court's rulings that the advances to him and the payment to Tufts may be credited as setoffs against the cure owed to him by BSR II. Instead, these remaining challenges take aim only at the District Court's rulings that denied his request for compensatory damages for his alleged emotional distress and his request for punitive damages as well as attorney's fees.

The parties agree that a seaman may be entitled to compensatory damages for emotional distress if the vessel owner acts unreasonably in breaching the duty of maintenance and cure and that breach caused the seaman emotional distress. See Morales v. Garijak, Inc., 829 F.2d 1355, 1357 (5th Cir. 1987). In challenging the District Court's denial of his request for damages for emotional distress, Aadland alleges that "if BSR II had fulfilled its duty [of cure], Tufts never should have been involved." As a result, Aadland contends that he then would not have experienced the "mental anguish of fighting with Tufts to receive coverage for the care" and would not have had to "live with the knowledge that Tufts could refuse to cover future care at any time." Aadland therefore argues that "but for BSR II's failure to fulfill its duty, [he] would not have been in coverage disputes with Tufts and would not have suffered from the mental anguish that the disputes caused him." He thus contends that the District Court erred in ruling for BSR II with respect to his claim for emotional distress damages.

This challenge rests, in part, on the contention that "[t]he District Court applied an erroneous causation standard" by applying a "direct causation standard rather than the standard tort causation standard." Aadland argues that, under that latter standard, he was entitled to judgment in his favor as to this

aspect of his claim. We conclude, however, that, even accepting Aadland's preferred causation standard, there is no merit to his challenge. Aadland fails to show that the emotional distress he experienced resulted from BSR II's breach.

Aadland contends that he is entitled to damages for emotional distress because he had to "fight[] with Tufts to receive coverage for the care" and those "coverage disputes" caused "mental anguish." The fact that Aadland experienced emotional distress during his interactions with Tufts does not necessarily show, though, that BSR II's breach caused that emotional distress. Aadland fails to make this showing.

The District Court found, and Aadland does not dispute, that the coverage disputes concerned whether Aadland was entitled to "admission to a skilled nursing facility (as opposed to an acute rehabilitation facility) and the frequency of his physical and occupational therapy." In order to show that this distress was caused by BSR II's breach, then, he must show that the breach caused these disputes. Aadland, however does not on appeal point to findings or evidence in the record supportably showing that, had BSR II timely satisfied its duty of cure, it would have paid for the higher level of care that he sought from Tufts.[4] See

---

[4] At oral argument, Aadland acknowledged that he had the burden to demonstrate that BSR II acted unreasonably and that the unreasonable conduct caused his emotional distress. He argued,

LeBlanc, 992 F.2d at 397 (recognizing that under the duty of cure a seaman is entitled to "necessary" healthcare expenses). Accordingly, Aadland fails to show that the coverage disputes that caused his emotional distress were caused by BSR II's breach because he does not point to findings or evidence supportably showing that BSR II would have acted differently than Tufts with respect to paying for the care in question in such a way that would have reduced the likelihood of those disputes. In other words, Aadland has not provided any evidence that the disputes resulted from BSR II's breach rather than from the nature of the care requests that he was making.

We also are not persuaded insofar as Aadland is arguing that he is entitled to damages for emotional distress because he had to "live with the knowledge that Tufts could refuse to cover future care at any time." He does not point to any factual finding or evidence in the record that establishes that he experienced such fear. In fact, he does not identify any factual finding or evidence that indicates that he was even aware of the fact that Tufts might not cover care resulting from his onboard illness.

---

however, that as a matter of equity, we should require BSR II to prove that Aadland would have faced the same emotional distress if BSR II -- rather than Tufts -- had paid for the care. This argument was not developed in his brief on appeal or before the District Court and is therefore waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

- 35 -

Aadland fails to do so, moreover, even though the District Court found that:

> Nothing in the trial record shows that Tufts threatened to stop covering Aadland's medical bills because a work-related injury was outside his insurance policy. Nor did the evidence at trial show when, prior to Tufts' receipt of the $400,000 payment, Aadland became aware that Tufts['] policy on work-related injuries might be invoked to exclude his treatment from coverage.

(Citation omitted). Indeed, Aadland does not directly argue that any of these factual findings were erroneous. Nor does he point us to any evidence in the record that contradicts them.

Moreover, as noted above, the District Court found that Aadland received all necessary medical care and Aadland does not directly dispute that finding. Nor do we see any reason to conclude that this finding was clearly erroneous, insofar as Aadland does mean to take issue with it on appeal. Aadland also does not point to any evidence supportably showing that the care covered by Tufts was at risk of falling below the level of care that he was entitled to receive under the duty of cure. And Aadland also neither points to any finding that indicates that BSR II would have paid for a higher level of care than his insurer did nor argues that the District Court clearly erred in failing to make such a finding. He also does not point to any evidence that Tufts acted in such a way that if BSR II acted in that same manner, it would have violated its duty of cure to him.

In sum, then, Aadland has failed to show -- regardless of the standard of causation -- how BSR II would have acted differently than Tufts during the relevant period. Thus, we have no evidentiary basis from which to conclude that Aadland would have been spared any emotional distress that he suffered if BSR II, rather than Tufts, had paid for his care and satisfied its duty of cure in the first instance.

We must reject, too, the argument that "the lower court also erred in finding that Aadland had to present evidence beyond his and his wife's testimony to prove causation." The District Court clearly noted that "expert testimony is not required to prove emotional damages" and nothing in the record suggests that the District Court nevertheless imposed such a requirement on Aadland.

## C.

There remains Aadland's challenge in his appeal to the District Court's denial of his request for punitive damages as well as attorney's fees. In Atlantic Sounding Co. v. Townsend, 557 U.S. at 424, the Supreme Court held that "[b]ecause punitive damages have long been an accepted remedy under general maritime law, . . . such damages for the willful and wanton disregard of the maintenance and cure obligation should remain available in the appropriate case as a matter of general maritime law." See also Dutra Grp., 588 U.S. at 375 (recognizing that "a claim of maintenance and cure . . . addresses a situation where the vessel

owner and master have 'just about every economic incentive to dump an injured seaman in a port and abandon him to his fate'" (quoting McBride v. Estis Well Service, LLC, 768 F.3d 382, 394 n.12 (5th Cir. 2014) (Clement, J., concurring))). And, for more than half a century, this Circuit has held that a district court has discretion to award punitive damages for the callous, willful, recalcitrant, or wanton failure to pay maintenance and cure. See Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1051-52 (1st Cir. 1973); see also Pino v. Prot. Mar. Ins. Co., 490 F. Supp. 277, 281 (D. Mass. 1980) ("It is settled in this Circuit that an admiralty court has discretion to award a seaman punitive damages when a shipowner's refusal to pay maintenance and cure was the result of a 'wanton and intentional' disregard of the seaman's legal rights." (quoting Robinson, 477 F.2d at 1051)).

Here, the parties do not dispute that a vessel owner is subject to punitive damages or obliged to pay the seaman's attorney's fees when the owner is callous, willful, recalcitrant, or wanton in failing to satisfy its obligations under the duty of cure. See Robinson, 477 F.2d at 1051. The parties also seem to agree that a vessel owner may defeat a claim for punitive damages as well as attorney's fees when it can show that it relied on a "reasonable defense" in not satisfying its claimed duty of cure. See Morales, 829 F.2d at 1358. The parties disagree, however, about whether, given those standards, BSR II's conduct permits the

imposition of those remedies. And the parties do so even though they appear to share the view that the District Court held that those remedies were not legally permitted here because BSR II's conduct in committing any breach of its duty of cure was not callous, willful, recalcitrant, or wanton.

We treat a district court's finding as to whether a vessel owner was callous, willful, recalcitrant, or wanton in failing to pay maintenance or cure as a factual finding that is reviewed only for clear error. See Trupiano v. Captain Gus & Bros., No. 94-1690, 1994 WL 702324, at *1 (1st Cir. Dec. 15, 1994); Breese v. AWI, Inc., 823 F.2d 100, 102-03 (5th Cir. 1987). As we will explain, we agree with Aadland that, contrary to the District Court's finding, it is clear from this record that BSR II's conduct in not fulfilling its duty of cure as of September 2020 was callous, willful, recalcitrant, or wanton. We reach this conclusion in part because, as we will explain, we agree with Aadland that it is clear that BSR II lacked a reasonable defense in failing to fulfill its cure obligation. We thus conclude that punitive damages and the award of attorney's fees may very well be appropriately granted as an exercise of discretion by the District Court. Accordingly, we vacate the District Court's denial of Aadland's request for punitive damages as well as attorney's fees and remand for further proceedings.

**1.**

We begin by addressing BSR II's arguments that we must affirm the denial of Aadland's request for punitive damages and attorney's fees on grounds independent of those on which the District Court relied. BSR II argues that, even setting aside the District Court's reasons for finding that it was not callous, willful, recalcitrant, or wanton in failing to fulfill its duty of cure as of September 2020 (insofar as it so failed), punitive damages and attorney's fees still are not permitted on this record. That is so, according to BSR II, because (i) the dispute between Aadland and itself over cure focused only on the adequacy of the cure that BSR II provided; (ii) delay in paying cure cannot, alone, justify punitive damages for breaching the duty of cure; and (iii) Aadland was not harmed by any breach of the duty of cure. We are not persuaded.

**a.**

To support the contention that "where, as here, the dispute was solely whether [it] provided adequate maintenance and cure, punitive damages would never have been appropriate," BSR II cites two cases: Harper v. Zapata Off-Shore Co., 741 F.2d 87 (5th Cir. 1984), and Richoux v. Jefferson Marine Towing, Inc., No. 13-375, 2014 WL 47335 (E.D. La. Jan. 6, 2014). We do not see how Harper, a Fifth Circuit case from 1984, assists BSR II's cause.

The Fifth Circuit acknowledged in that case that, for the purposes of awarding punitive damages, "grossly inadequate" payments were distinguishable from a shipowner's "good faith" payments that later turned out to be inadequate. Harper, 741 F.2d at 90. As we explain more fully below, the willfulness of BSR II's unreasonable delay in paying cure and the clear evidence of its breach makes this case more like the former, rather than the latter, situation. Furthermore, Harper appears to be but one link in the Fifth Circuit's chain of cases limiting the awards of punitive damages. In fact, the Fifth Circuit subsequently barred punitive damages altogether in maintenance and cure cases. Yet the Supreme Court has now held that punitive damages are available in such cases. See Guevara v. Mar. Overseas Corp., 59 F.3d 1496, 1513 (5th Cir. 1995) (barring punitive damages), abrogated by Atl. Sounding Co., 557 U.S. at 404.

The second case cited by BSR II on this point is an unpublished, out-of-circuit decision that followed the relevant holding from Harper as binding precedent. Richoux, 2014 WL 47335, at *5 (citing Harper, 741 F.2d at 88). That decision thus fails to help BSR II for the same reasons that Harper fails to do so.

In addition, given the purposes of punitive damages, we see no reason to deem the award of such damages categorically impermissible in cases that involve a failure by the vessel owner to pay some but not all cure owed. See Vaughan, 369 U.S. at 533

("It would be a sorry day for seamen if shipowners, knowing of the claim for maintenance and cure, could disregard it . . . and then evade part or all of their legal obligation by having it reduced . . . . This would be a dreadful weapon in the hands of unconscionable employers . . . ."); BMW of North America, Inc. v. Gore, 517 U.S. 559, 568 ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."). In fact, other cases have imposed punitive damages and attorney's fees where the vessel owner did pay some cure and thus where the question presented concerned only the adequacy of that cure. E.g., Hicks v. Tug PATRIOT, 783 F.3d 939, 940-41 (2d Cir. 2015); Hines, 820 F.2d at 1190.

**b.**

We next address BSR II's argument that "delay alone is not grounds for punitive damages as a vessel owner presented with a claim for maintenance and cure is entitled to investigate and require corroboration before paying maintenance and cure." For this proposition, BSR II relies on Sullivan v. Tropical Tuna, Inc.

That case did note that "the shipowner need not immediately commence payments; he is entitled to investigate and require corroboration of the claim." Sullivan, 963 F. Supp. at 45 (quoting Morales, 829 F.2d at 1358). But Sullivan did not suggest that a delay in paying cure could never support a request for

punitive damages. In fact, it did not address punitive damages for a breach of the duty of cure at all. See id. at 45-47 (discussing seaman's entitlement to compensatory damages and attorneys' fees but not discussing punitive damages).

In addition, as discussed above, BSR II has not shown how the need to investigate and corroborate Aadland's entitlement to cure could justify its six-year delay in paying cure (given that, as we have explained, the advances were not cure), from the onset of the illness to the Tufts settlement payment. BSR II's failure in that regard is even more conspicuous once we account for Sullivan having found that the shipowner in that case "breached [the duty of maintenance and cure] by delaying one month before approving [the seaman's] surgery, and that this breach was both unreasonable and willful." Id. at 45.

In sum, BSR II's categorical contention that delay is "not grounds for punitive damages" reflects neither our precedent nor even the case that BSR II cites for the proposition. It thus provides no support for BSR II's position.

**c.**

BSR II's remaining independent ground for affirming the judgment as to punitive damages is that "[p]unitive damages only become appropriate where the injured seaman has incurred some loss or endured unduly prolonged suffering." Once again, BSR II purports to derive this rule of law from Sullivan. As we have

- 43 -

explained, however, that decision lacked any discussion of the appropriate circumstances in which to award punitive damages.

In any event, BSR II mischaracterizes the purpose of punitive damages in pressing this line of argument. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003) ("[I]n our judicial system compensatory and punitive damages, although usually awarded at the same time by the same decisionmaker, serve different purposes. . . . [P]unitive damages . . . are aimed at deterrence and retribution."). Nor do we see a reason to add a requirement that the withholding of cure must have caused incremental injury, given the Supreme Court's clear holding in Atlantic Sounding that punitive damages are available for willful withholding of cure. See Atl. Sounding, 557 U.S. at 424. We thus reject BSR II's argument that punitive damages are not "appropriate," as a categorical matter, unless the seaman has "incurred some loss or endured unduly prolonged suffering."

**2.**

We turn, then, to the District Court's reasons for denying Aadland's request for punitive damages and attorney's fees. The District Court explained that:

> BSR II paid regular advances to Aadland to cover his mortgage payments, insurance payments, and living expenses, it paid his out-of-pocket medical expenses, there were not any medical expenses presented to BSR II that

- 44 -

> it declined to pay, and ultimately, it paid Tufts in satisfaction of any lien or claim Tufts might bring against Aadland. Patania was in close contact with Aadland throughout his treatment. Also, on the record here, Aadland timely received all care deemed medically necessary. . . . Indeed, as the First Circuit's opinion and [the District Court]'s analysis reveal[], it was not clear given the unusual facts of this case whether BSR II was liable for Aadland's medical treatment where it was covered by private insurance paid for with deductions from his wife's paycheck or made from their joint account including when Aadland was receiving advances from BSR II.

The District Court then ruled that, "having considered the entirety of the record, . . . even if BSR II had failed to cure in a timely manner, Aadland has not shown that BSR II was callous, willful, or recalcitrant in such failure."

As noted above, we do not understand the District Court merely to have made a discretionary determination that no punitive damages or attorney's fees should be awarded for BSR II's callous, willful, recalcitrant, or wanton failure to satisfy its duty of cure as of September 2020. We instead read the District Court to have ruled that, as a matter of law, no punitive damages or attorney's fees could be awarded on this record because of its finding that BSR II had not engaged in a callous, willful, recalcitrant, or wanton failure to satisfy its duty of cure as of September 2020 (insofar as such a failure occurred). However, for the reasons we will explain, we cannot agree with the District

- 45 -

Court's finding in this regard. Rather, we conclude that it is clear on this record that BSR II did breach the duty of cure and that the breach was callous, willful, recalcitrant, or wanton. Thus, we are compelled to conclude that the District Court's contrary finding does not survive clear error review. See Trupiano, 1994 WL 702324, at *1; Breese, 823 F.2d at 102-03.

To set the stage, we emphasize that Aadland bears the burden of establishing that BSR II was callous, willful, recalcitrant, or wanton in breaching its duty of cure. See Atl. Sounding Co., 557 U.S. at 407; Robinson, 477 F.2d at 1051. That a breach occurred is clear, for the reasons we have explained. Accordingly, the critical issue with respect to the request for punitive damages as well as attorney's fees concerns whether after reviewing the record we are "left with the definite and firm conviction that" Aadland has also met his burden to establish that BSR II willfully committed that breach, notwithstanding the District Court's contrary finding. Jose Santiago, Inc. v. Smithfield Packaged Meats Corp., 66 F.4th 329, 340 (1st Cir. 2023) (quoting García Pèrez v. Santaella, 364 F.3d 348, 350 (1st Cir. 2004)).

For all the reasons that we have explained, Aadland has shown what he must to establish that, unless there is some basis for supportably finding that BSR II reasonably understood that it had somehow satisfied that duty even though it had not, BSR II was

- 46 -

willful in breaching its duty of cure and that it was clear error to conclude otherwise. But we see no basis in the record for concluding that BSR II has made such a showing, even accounting for the District Court's findings.

In explaining its punitive damages ruling, the District Court pointed to its finding that "Aadland timely received all care deemed medically necessary." But the mere fact that Aadland paid for and received sufficient medical care fails to suffice to show that BSR II was not callous, willful, recalcitrant, or wanton in breaching its duty of cure, precisely because it is clear on this record that BSR II did not itself pay either for the care or for Aadland's insurance. Thus, this finding -- supported though it is -- provides no basis for finding that BSR II was not callous, willful, recalcitrant or wanton in committing the breach of its duty of cure that we conclude the record clearly shows that it committed.

Second, we fail to see why the fact that "Patania was in close contact with Aadland throughout his treatment" shows that BSR II was not callous, willful, recalcitrant, or wanton in not fulfilling it duty of cure.[5] As we have explained, there was a breach of the duty of cure, and nothing about the fact that Patania was in "close contact" suggests that BSR II was unaware of its

---

[5] As a reminder, Patania is one of the owners of BSR II.

- 47 -

duty to provide cure or that it had a reasonable basis for concluding that it had satisfied that duty. If anything, that fact indicates that BSR II was aware of Aadland's need for medical care due to his onboard illness and yet still breached.

Third, the fact that BSR II paid Aadland's out-of-pocket medical expenses fails to provide any basis for concluding that BSR II's clear breach was not callous, willful, recalcitrant, or wanton. As Aadland points out, those expenses constituted less than one percent of the cure obligation. See Hicks, 783 F.3d at 941, 945 (awarding punitive damages and attorney's fees in case where vessel owner had paid some maintenance and cure); Hines, 820 F.2d at 1189-1190 (same); Sullivan, 963 F. Supp. at 45 (finding vessel owner's "breach was both unreasonable and willful" even though the vessel owner "ha[d] now paid all of [the seaman's] medical bills"). Indeed, the payment of these expenses provides at least some evidence that BSR II understood that it owed cure.

The District Court did also base its denial of punitive damages and attorney's fees on its finding that:

> [A]s the First Circuit's opinion and [the
> District Court]'s analysis reveal[], it was
> not clear given the unusual facts of this case
> whether BSR II was liable for Aadland's
> medical treatment where it was covered by
> private insurance paid for with deductions
> from his wife's paycheck or made from their

- 48 -

joint account including when Aadland was receiving advances from BSR II.[6]

We thus need to consider this ground for the District Court's finding that BSR II was not callous, willful, recalcitrant, or wanton in breaching its duty of cure.

We set aside for the moment the potential import to this issue of the fact that BSR II was paying advances to Aadland. That way we first can focus on the potential import of the fact that Aadland was paying the costs of his care through insurance that was paid for both from an account that he held jointly with his wife and through deductions from her paychecks. We do not see how this fact, however, provides a basis for finding that the breach of the duty of cure was not callous, willful, recalcitrant, or wanton.

---

[6] We understand the District Court to have found that "the unusual facts" that Aadland's wife contributed to his insurance and that BSR II paid advances to Aadland made BSR II's liability unclear. To the extent that the District Court can be read to have concluded that either our prior opinion, by remanding for a determination as to how Gauthier applied to the advances, or the complex procedural history of this case demonstrates ambiguity over whether BSR II had a duty of cure that it had failed to satisfy, we disagree. In our prior ruling, we vacated the District Court's prior denial of punitive damages and remanded for further proceedings. Aadland I, 42 F.4th at 52. But we did not address whether BSR II had reason to doubt that it had failed to satisfy its duty of cure insofar as the advances were loans and Gauthier applied. We thus in no way suggested that BSR II had reason to understand that it had fulfilled its duty of cure if (1) it accepted that Gauthier was applicable insofar as it was not distinguishable on its facts and (2) the record clearly established that the advances functioned as loans.

As we have explained, the parties agree that BSR II is not obliged to pay punitive damages for that breach if, at the time, it had a reasonable defense against satisfying the now-undisputed cure obligation. But, in ruling on the punitive damages issue on remand, the District Court did not suggest that BSR II had a reasonable basis to have understood <u>Gauthier</u> to be inapplicable apart from the possible basis arising from the "unusual facts" that the private insurance in this case was paid for through funds tied to Aadland's wife while BSR II was paying advances.[7] And, we fail to see what reasonable basis BSR II would have had for concluding that <u>Gauthier</u> would not apply in this specific case simply because Aadland's insurance was being paid with funds that came from his wife.

---

[7] We note that the District Court's finding that BSR II did not act willfully insofar as it breached its duty of cure was not premised on a finding that it was reasonably unclear that <u>Gauthier</u> had any application to Aadland's circumstances because this Circuit as of September 2020 had not adopted the reasoning of that case. Further, at no point in the litigation has BSR II developed an argument that it reasonably did not know if a court in the First Circuit would adopt the logic of <u>Gauthier</u> in circumstances analogous to those of the Fifth Circuit case. Indeed, BSR II favorably cited <u>Gauthier</u> in the first appeal. Insofar as BSR II has argued that it reasonably did not know that <u>Gauthier</u> would apply to this case, it did so only on the basis that <u>Gauthier</u> was factually distinguishable because of the involvement of Aadland's wife and given the advances it paid to Aadland. <u>Aadland I</u>, 42 F.4th at 51. Accordingly, we do not address whether BSR II's conduct could have been reasonable -- and therefore not willful -- given the potential uncertainty over whether a court in this Circuit would adopt the logic of <u>Gauthier</u> in circumstances analogous to those of that case.

In that regard, and as we noted above, we held in the prior appeal in this case that there was no merit in BSR II's attempt to distinguish the present circumstances from those present in Gauthier based on the involvement of Aadland's wife in securing the health insurance from Tufts. Aadland I, 42 F.4th at 46-48. Moreover, insofar as the fact that Aadland relied on his wife's resources might have been thought to raise any question about Gauthier's applicability, we do not see how it raised a question that reasonably supported a conclusion that Aadland did not pay for his care "alone" within the meaning of Gauthier. It has been clear for nearly three quarters of a century that "the shipowner's liability for maintenance and cure [is] among 'the most pervasive' of all and that it [is] not to be defeated by restrictive distinctions nor 'narrowly confined.'" Vaughan, 369 U.S. at 532 (quoting Aguilar v. Standard Oil Co., 318 U.S. 724, 730 (1943)). As a result, it has also been the law for that long that "[w]hen there are ambiguities or doubts, they are resolved in favor of the seaman." Id. (emphasis added).

We note, too, that there was no finding below that either Aadland or BSR II subjectively understood at any time prior to September 2020 that Aadland's wife's involvement would affect BSR II's obligation to pay cure. Nor does BSR II identify any evidence to support such a finding. Thus, the assertedly "unusual fact[]" that Aadland drew on his wife's resources to cover his

- 51 -

health insurance provides no basis for concluding that BSR II had a reasonable belief that it either had no duty of cure or that it had satisfied that duty.

That leaves, then, only the question of whether the "unusual fact[]" that BSR II was paying advances to Aadland in and of itself provides a basis for finding that BSR II's failure to satisfy its full obligation under the duty of cure was not callous, willful, recalcitrant, or wanton. We understand the District Court to have concluded that, because of the advances, "it was not clear" whether Aadland "alone" paid for his health insurance. We thus understand the District Court to have concluded on that basis that it also was not clear whether, under Gauthier, "BSR II was liable for Aadland's medical treatment." But we cannot agree.

Gauthier holds that when a seaman alone pays for health insurance, the seaman incurs, for the purposes of cure, the full cost of his care even if the insurer directly bears the cost of the care. Gauthier, 752 F.2d at 1090. And, in our prior decision in this case, we held that, under Gauthier, Aadland would have paid "alone" if the advances functioned as loans. Aadland I, 42 F.4th at 46. Thus, if it were clear that the advances functioned as loans, then the advances could not have provided a reasonable basis for BSR II to conclude that, insofar as Gauthier did apply, the reasoning there would not apply here. And, as discussed above, we see no basis for concluding on this record that these advances

- 52 -

functioned as anything other than loans.  See Block Island Fishing, 844 F.3d at 366 (citing Boudreaux, 721 F.3d at 728).[8]

In any event, even if it were reasonably unclear that Gauthier applied here due to the advances, BSR II would still have been responsible for at least some portion of Aadland's premium payments.  Yet, this record makes clear that BSR II would not have timely satisfied that obligation.

As BSR II concedes, it has been clear since around November 2014 that Aadland is entitled to cure to cover reasonably necessary medical treatment resulting from his July 2014 onboard illness.  And the obligation to pay the premiums would have been part of that obligation, even if Gauthier were inapplicable.  At least until 2020, however, BSR II did not pay cure -- given that the advances clearly were loans -- to Aadland, apart from its reimbursement of Aadland's out-of-pocket expenses that collectively represent less than one percent of BSR II's cure obligation.  The advances, then, do not alter our understanding that BSR II clearly was willful in failing to pay timely cure for a period of at least five years.

---

[8] We do note that the District Court supportably found that BSR II did not communicate to Aadland that the advances were to be used to pay for his premiums and that we see no error in the District Court's finding that BSR II did not, in paying the advances, dedicate the payments to Aadland's healthcare expenses. Moreover, we also note that BSR II makes no argument that a seaman's mere receipt of funds from the vessel owner shows that the seaman did not alone pay for his insurance.

As a final note, the District Court concluded that BSR II was not callous, willful, or recalcitrant after "[h]aving considered the entirety of the record." The District Court did not state that there were any other features of the record -- beyond those that we have not already addressed -- that would support such a conclusion. But, if it did have some such features in mind, we emphasize that our own review of the entirety of the record, if anything, only tends to reinforce our reasons for concluding that the record clearly shows that BSR II was willful in not fulfilling its duty of cure as of September 2020.

In that regard, we note that the record supportably shows the following: on November 10, 2014 -- almost four months after Aadland's injury and three months before the first advance payment was made -- BSR II's insurance broker informed Patania of concerns from BSR II's insurance claims adjuster regarding BSR II's failure to provide maintenance and cure. The concerns were "that by failing to act at this time [BSR II and Patania] may be exposing [themselves] to [punitive] damages" and to avoid this issue they should "promptly advise Mr. Aadlund [sic] of his probable right to maintenance and cure." Yet, at the end of November 2014, BSR II's marine casualty investigator informed Aadland that it was a "big if" whether BSR II would be able to provide any financial support and that nothing could be done until he left the hospital. When Cynthia Aadland reported to Patania that Aadland's benefits would

not be clear until Aadland left the hospital, Patania responded "Ok." BSR II offers no explanation to us as to why Aadland would have to leave the hospital for BSR II to begin cure payments or to assess his entitlement to maintenance and cure.

Further documentation between BSR II's insurance claims adjuster and casualty investigator also suggests that BSR II was aware by January 22, 2015 that Tufts was paying for Aadland's medical care and that the total bills "[were] in the amount of $600,000," but "[d]ue to the fact that this illness was not initially presented and that medical bills are being paid for by a health insurance carrier, [BSR II's casualty investigator] [has] refrained from requesting medical records from healthcare providers." BSR II's casualty investigator continued to monitor Aadland's condition and provide status updates to BSR II's insurance company, in which, in September 2015, he described that BSR II would "not be requesting medical reports due to that fact that care is being provided through a third party." By March 2016, BSR II indicated its belief that Aadland's healthcare benefits had run out and that he was seeking healthcare through other means, yet there is no indication that BSR II at that time attempted to provide cure to ensure that Aadland received necessary care. And, just a few months later, BSR II's casualty investigator also acknowledged that "Tuft's [sic] Medical has not filed any liens and to the best of my knowledge have not been notified that this

could possibly be a work-related illness and therefore unless something else develops in the near future I do not see that as a potential exposure for the cure issue at this time." (Emphasis added).

We need not dig any deeper. At a minimum, these features of the record suggest that BSR II was aware by November 2014 of its potential exposure to punitive damages in delaying paying cure, that it continued to wait to provide payments until February 2015, that it chose to avoid requesting medical records and addressing the "cure issue" as Aadland was covered by third-party insurance, and that it did not offer to pay the premiums for that insurance. These features of the record fail to provide support for a finding that BSR II had a reasonable basis for understanding either that it had no duty of cure or that it had timely satisfied that duty as of September 2020.

In sum, the evidence clearly shows that Aadland was owed a duty of cure following the onset of his illness; that (under Gauthier) he nonetheless "alone" paid for the costs of the bulk of his related healthcare; that BSR II did not meet its cure obligation; and that, in any event, even what BSR II contends constituted cure was not paid in full in a timely manner. Moreover, we conclude that none of the District Court's reasons for finding that BSR II did not act willfully in acting in this manner hold up, and we see no other basis in the record for finding

that BSR II's conduct in breaching its duty of cure was anything other than willful.

Thus, given the fact that BSR II's independent arguments for affirmance are not persuasive, the clear evidence of breach, the length of the delay in paying cure, and the lack of a reasonable defense as to the nonpayment of cure, we conclude that, on this record, it is clear that Aadland has met his burden to show that BSR II's breach of its cure duty was callous, willful, recalcitrant, or wanton. See Atl. Sounding Co., 557 U.S. at 407; Robinson, 477 F.2d at 1051. As a result, we vacate the District Court's denial of Aadland's request for punitive damages and attorney's fees.

That said, a finding of callous, willful, recalcitrant, or wanton breach is only a precondition to an award of punitive damages and attorney's fees. See Atl. Sounding Co., 557 U.S. at 409. The determination of the proper award for such a breach is one that must be made as an exercise of sound discretion, based on what the record shows regarding that breach. We leave to the District Court on remand the assessment of whether, in its discretion, punitive damages and attorney's fees should be awarded and, in the event that punitive damages are awarded, what amount of punitive damages would be appropriate.

**D.**

Having determined that we must vacate the District Court's ruling as to punitive damages as well as attorney's fees, we still must address Aadland's contention, separate from the merits, that, upon remand, we should assign the case to a different District Court judge. We see little reason to require a new judge to become familiar with this extensive record. This is a complicated case that has been handled well and with care. Thus, we see no reason to exercise our discretion in the manner that Aadland requests.

**IV.**

We now turn our attention to the arguments that BSR II presents in its cross-appeal: first, that the District Court's finding that Aadland had not reached MMR was clearly erroneous; and second, that BSR II should receive a $605,338.07 setoff for the $400,000 payment it made to Tufts because that $400,000 payment extinguished a potential lien against Aadland of $605,338.07 and so the value to Aadland was, according to BSR II, actually $605,338.07.

**A.**

In challenging the District Court's finding that Aadland had not reached MMR as of September 2020, BSR II maintains that it was clear error to reach that conclusion given the evidence in the record. We cannot agree.

BSR II does not dispute that it has the burden to show that Aadland had reached MMR as of September 2020. On appeal, BSR II points to two pieces of evidence that it contends show that the District Court erred and that Aadland's health issues are no longer improving. First, BSR II points to a note from Dr. Wener, one of Aadland's treating physicians. In December 2015, Dr. Wener commented, with regard to Aadland's health: "He is doing amazingly well at this point. He will stay on lifelong prophylactic penicillin . . . . He will continue lymphedema management . . . . I will see Mr. Aadland back in . . . 4 months, if not needed sooner." Second, BSR II notes that "Aadland's cardiologist, Dr. Mascari, had placed him on Coumadin for life." On appeal, BSR II does not highlight any other evidence in the record that it contends shows Aadland has reached MMR.

Aadland, in response, argues that we should "decline to take up BSR II's argument" on this point because we previously ruled, in our 2022 decision, that BSR II failed to meet its burden to prove MMR at trial and that ruling is final. In the alternative, Aadland argues that even if we do reach the issue, we should affirm the District Court's finding that BSR II failed to meet its burden because "[n]one of the medical records support a finding that a medical determination has been made by those treating Aadland that he has unequivocally met a medical end."

We proceed to the merits. The District Court ruled on this issue, BSR II timely appealed that ruling, and our ruling in the prior case did not foreclose continued consideration of this issue in the current litigation. We nonetheless affirm the District Court's finding that BSR II failed to meet its burden to show that Aadland is no longer improving.

The two pieces of evidence BSR II points to on appeal -- a comment from a treating physician and a lifetime prescription from that physician and another doctor -- do not show that the District Court clearly erred in finding that BSR II had failed to show by a preponderance of the evidence that further treatment is merely palliative rather than curative. See 1 Robert Force & Martin J. Norris, The Law of Seamen § 26:37 (5th ed. 2024) ("The mere fact that a seaman suffered a permanent injury does not foreclose the possibility of improvement."). Thus, we conclude that the District Court did not clearly err in ruling that Aadland had not reached MMR as of September 2020.

We do acknowledge, however, that the District Court's judgment in this respect was limited only to holding that BSR II had an ongoing duty to provide cure after that time. On remand, the District Court should determine the amount of maintenance still owed. See Whitman, 387 F.3d at 71-72 (explaining that an injured seaman is entitled to maintenance and cure until MMR is reached).

BSR II does contend that "[e]ven if BSR II has not shown by a preponderance of evidence that Aadland is no longer receiving curative treatment, it does not necessarily follow that Aadland is correct that BSR II should be ordered to resume payment of maintenance and cure." BSR II contends that this is so because "Aadland has failed to provide any documentation" after BSR II "requested Aadland's current maintenance expenses as well as his current treatment records and corresponding expenses."

This dispute about post-trial interactions between the parties was not developed below, however, and we decline to address it. On remand, though, the District Court may consider any relevant arguments about BSR II's duty to pay maintenance and cure -- including arguments that Aadland has reached MMR since September 2020 or has failed to comply with his requirements resulting from his receipt of maintenance and cure.

**B.**

Finally, BSR II contends that "[t]he District Court erred in only crediting the dollar amount of BSR II's settlement with Tufts against BSR II's cure obligation." BSR II argues that because its $400,000 payment to Tufts extinguished Tufts' potential claim against Aadland, BSR II should receive "the full value of that settlement to Aadland," or $605,338.07, as an offset for its payment. BSR II maintains that "[w]hether BSR II repaid Tufts in full or negotiated the settlement it did, the net result

was the same; the Aadlands were relieved of any liability to Tufts." Based on this premise, BSR II maintains that "[i]n failing to credit BSR II the full value of the bargained for settlement, the District Court has awarded Aadland a double recovery." We are not persuaded.

The District Court credited the $400,000 payment to Tufts as a setoff because Aadland had "acknowledge[d] this amount 'should be credited towards [BSR II's] cure obligation.'" (Emphasis added). Thus, the only reason offered by the District Court for applying BSR II's payment to Tufts as a setoff against the judgment is Aadland's concession on that point. But that concession only supports offsetting the judgment by $400,000.

The District Court found Aadland "acknowledge[d] this amount" -- and thus not some greater amount -- "should be credited towards [BSR II's] cure obligation." Given the District Court's reasoning below cannot provide a basis for concluding a greater amount should apply as a setoff, BSR II's argument that it is entitled to a setoff of greater value can succeed only if there is some other ground for concluding that the payment to Tufts should apply as a setoff at all. But we do not understand BSR II to have developed an argument that we should find another basis for applying the payment as a setoff.

We note also that the District Court did not find -- and the record does not conclusively show -- that Tufts did have a

lien in the amount of $605,338.07.  And BSR II does not argue on appeal that the District Court clearly erred by not finding that Tufts had a lien of $605,338.07 against Aadland for his care.  In the absence of such a finding, the record does not make clear whether Tufts could have attempted to exercise its potential lien, or whether Aadland may have successfully demonstrated that his treatment was covered by the Tufts policy and so no lien could be filed against him.

Thus, given the absence of any findings as to whether Tufts in fact had a lien against Aadland or findings as to the value of such a lien, we have no basis on which to conclude that BSR II is entitled to $605,338.07 as a setoff for its payment to Tufts.  And that is so even assuming that there was another basis on which to find that the settlement to Tufts should result in some amount to be offset against the judgment.  Accordingly, we decline to adjust the setoff that the District Court provided to BSR II for its payment to Tufts.

## V.

For the foregoing reasons, we **affirm** the judgment for BSR II on Aadland's claim for compensatory damages for emotional distress.  We **vacate** the District Court's judgment on Aadland's claims for punitive damages and attorney's fees and remand so that the District Court may determine in its discretion whether and in what amount those damages should be awarded.  We **affirm** the

District Court's conclusion that Aadland had not reached MMR as of September 2020 and **affirm** the conclusion that BSR II should receive a $400,000 setoff for the payment to Tufts.  We also **decline to order** that a new district court judge take the case upon remand. The parties shall bear their own costs.